### SMITH v. STALEY.

(District Court, W. D. New York. June 7, 1911.)

SHIPPING (§ 71*)—MASTER—ACTION AGAINST FOR NEGLIGENCE.

Evidence considered in an action in personam against the master of a tug for the death of libelant's intestate alleged to have been drowned through the negligent navigation of the tug by respondent and *held* not to sustain such allegation.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 71.*]

In Admiralty. Suit in personam by Thomas Smith, administrator of Thomas E. Smith, deceased, against Simeon Staley. Decree for respondent.

Hoyt & Spratt and H. E. Rourke, for libelant.
Clinton B. Gibbs, for respondent.

HAZEL, District Judge. The libel alleges that the decedent was drowned on October 23, 1905, on account of the careless and negligent

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

navigation of the steam tug Hudson by her master, the respondent, and, further, that the tug was unseaworthy, and that the steamer Huron which came in collision with said tugboat in Buffalo river was also negligently navigated. The owner of the Huron has not been served with process. No testimony was given to show that the machinery of the tug was defective or that she was unseaworthy. The material facts briefly stated are as follows:

The freight steamer Huron came into Buffalo river under her own power unassisted by a tug and navigating just prior to the collision at about 3 or 4 miles an hour. There was a strong gale from the southwest blowing approximately 40 miles an hour. At the place of collision, where the river is about 230 feet wide, the steamer Ramapo was moored to the Lackawanna dock with her bow towards Commercial Slip and about 50 feet southerly therefrom. Across the river moored to the shore one behind the other were two other vessels, leaving a passway of about 125 feet of water space. There is a bend in the river below Commercial Slip, and it became necessary for the steamer in turning to swing on her port wheel and then kick ahead at full speed to straighten in her course. The respondent claims that as the steamer Huron approached the Commercial Slip the tugboat turned into the river, going in the same direction; that the steamer passed the tug, and in her efforts to straighten up in her course she crowded the tug against the steamer Ramapo, impinging her, in consequence of which she immediately sank to the bottom of the river. The decedent, who had previously entered the after cabin of the tugboat, was drowned. The evidence is conflicting as to whether the steamer passed the tug, or whether the tugboat overtook the steamer and attempted within narrow water space to "glide between the Huron and the Ramapo."

Libelant's claim of negligence on the part of the master of the tugboat is not satisfactorily supported, and I do not believe that the collisions were due to any inattention on his part. It would undoubtedly have been a fault in the tug, in view of the severity of the wind, to go so near the Huron, had she been ahead, as to be unable to avoid her when she came to make the turn in the bend of the river, and, moreover, it would also have been a fault to have attempted to pass the steamer without blowing a proper signal and receiving her consent, as provided by rule 25 of the White Law and rule 9 of the Pilot Rules, but such alleged acts of want of proper precaution are not proven by a fair preponderance of the evidence. The weight of the evidence is to the contrary. The witness Quilligan, master of the Ramapo, who was in an excellent position to observe the maneuvers of the steamer and tug, testified that the rate of speed of the Huron after he first observed her was from three to four miles an hour, which was reduced to two miles an hour at the time the turn in the bend of the river was made; that there was sufficient room for the two boats to pass side by side and pass the Ramapo. He testified that he saw the Huron sheering and there was imminent danger of her coming in contact with the Ramapo. He was unable to state whether the tug or the steamer was ahead. Although the credible facts are meager we may indulge in

the probability that the steamer was slightly ahead and that in turning she sheered into the tug, such sheer being undoubtedly caused by the severity of the wind. This probability finds support, it seems to me, in the fact that the steamer was light forward and loaded aft, making it difficult to break the sheer. In proceeding alongside the steamer the tugboat was not in a dangerous position. She had a right to leave Commercial Slip irrespective of whether the bow of the Huron was ahead at the time she left, or whether her bow was 60 or 70 feet to the rear. It seems to me on the evidence presented that the respondent had the right to presume that the steamer would proceed in her course and safely make the turn in the river.

The libel is dismissed, with costs.